UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

LAURA BAUER,

        Plaintiff,

                                                                         Case Number 04-10135-BC

v.                                                       Honorable David M. Lawson

METROPOLITAN LIFE INSURANCE
COMPANY and THE DOW CHEMICAL
COMPANY,

        Defendants.
_____/

**<u>OPINION AND ORDER GRANTING DEFENDANTS'
MOTION TO AFFIRM PLAN ADMINISTRATOR'S DECISION
AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

The plaintiff, Laura Bower, has brought this action against the defendants in their capacity as administrators of an employee welfare benefit plan as defined by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.*, because they terminated the plaintiff's benefit payments under a long-term disability plan. The plaintiff began receiving benefits for a time based on disability due to peripheral neuropathy, fibromyalgia, Sjogren's syndrome, and depression. Metropolitan Life Insurance Company (Met Life) terminated those monthly benefit payments when it determined that Bauer was no longer disabled under the terms of the plan. Bauer argues that Met Life arbitrarily denied her benefits in violation of ERISA. Met Life claims Bauer has presented no objective evidence supporting her disability; rather, it contends that she is capable of performing her job, which is sedentary in nature, and therefore does not qualify for benefits under the plan. The parties have filed cross motions on the administrative record, and the Court heard oral argument in open court on October 20, 2005. The parties agree that the administrator's decision must be reviewed against the arbitrary and capricious standard. The Court finds that the plan

administrator's decision was neither arbitrary nor capricious and therefore will deny the plaintiff's motion to reverse the administrator and grant the defendants' motion to affirm the plan administrator's decision.

I.

The plaintiff, now fifty-one years old, worked for Dow for over 30 years, most recently as a client service associate, a sedentary position. She was responsible for troubleshooting and paying difficult invoices, making purchases of items under $10,000, training, correcting entries, and "leading adherence to the work process." A.R. at 78. According to the defendants, in an eight hour day the plaintiff's job required the following: use of both hands repeatedly for 5 to 6 hours; sitting for 5 to 6 hours; grasping with both hands for 5 to 6 hours; fine finger dexterity in both hands for 5 to 6 hours; twisting her head and neck, looking up and down, for 1 to 2 hours; and standing, walking, or bending over for 1 to 2 hours.

On January 11, 2002, the plaintiff began a medical leave of absence from work. For several months prior, she experienced numbness in her arms and wrists accompanied by neck and back pain. The pain worsened to the point that the plaintiff felt that she could no longer work. Since then, she has seen five doctors and a social worker: Dr. Leslie Schutz, a rehabilitation specialist; Dr. Michael Beaulieu, family physician; Dr. Mark Adams, a neurosurgeon; Dr. Steven Beall, a neurologist; Dr. Sanjeev Prakash, a rheumatologist; and Laurie Clements, a clinical social worker.

As an employee, the plaintiff was covered by Dow's long-term disability benefit plan. The plan includes a six-month waiting period and an evolving disability definition. In the first phase, which lasts for twenty-four months after the waiting period, to qualify for benefits an employee "cannot, because of a sickness or an injury, perform [her] regular job or any other reasonably

appropriate job [her] Employer can provide." A.R. at 6. The phase two disability definition requires an employee to establish that "because of sickness or an injury [she cannot]: a. do [her] job; and b. do any other job for which [she is] reasonably fit by [her] education, . . . training[,] or . . . experience (including work with a Participating Employer, self-employment or work with another employer)." A.R. at 6. Met Life is both the insurer and administrator of phase one of the plan, which is at issue here.

On May 9, 2002, Dr. Schutz, to whom the plaintiff was referred by her family doctor, completed a form labeled "Disability Claim Attending Physician Statement." Dr. Schutz wrote that the plaintiff suffered from degenerative disc disease, cervical disc herniation, thoracic myofacial pain, and carpal tunnel syndrome. Dr. Schutz opined that the plaintiff could sit, stand, or walk intermittently for six hours, but she needed "frequent position changes, including reclining at times." A.R. at 62. Dr. Schutz stated the plaintiff "could try" working two to four hours per day, to be increased "as tolerated." *Ibid.*

Also some time in May 2002, Dr. Beaulieu completed a "Disability Claim Attending Physician Statement." He diagnosed the plaintiff with myofacial thoracic pain, bilateral carpal tunnel syndrome, and adjustment reaction with anxiety. He also deferred to Dr. Schutz's opinion as to the plaintiff's physical limitations.

On May 15, 2005, the plaintiff applied to the defendants for long term disability benefits under the plan. The forms from Dr. Schutz and Dr. Beaulieu were submitted to the defendants in support of her claim for benefits. The defendants approved the plaintiff's application, apparently accepting Dr. Schutz's opinion of the plaintiff's limitations and concluding that she could not perform the requirements of her job. The plaintiff was notified of the approval on July 11, 2002.

On September 12, 2002, Dr. Beaulieu completed another "Attending Physician Statement." He again indicated that the plaintiff suffered from degenerative disc problems, myofacial thoracic pain, and carpal tunnel syndrome. Dr. Beaulieu wrote that the plaintiff "requires frequent posture changes. Ability to sit or stand for long periods is very limited." A.R. at 101. Dr. Beaulieu stated that the plaintiff could work less than four hours per day.

In September 2002, Dr. Beaulieu referred the plaintiff to Dr. Beall, a neurologist. The plaintiff reported to Dr. Beall that she was experiencing numbness and tingling from her shoulder to her fingers. She also had blurred vision and decreased sensation in her legs and forearms. Dr. Beall's notes state that "this may very well be carpal tunnel syndrome or thoracic syndrome. The upgoing toes and tingling that she has, as well as the blurring of the vision makes diagnosis of multiple sclerosis a possibility." A.R. at 110. Dr. Beall recommended additional tests.

On December 20, 2002, Dr. Beall saw the plaintiff again. She reported numbness and tingling in her shoulder and arm, and "every joint in her body hurts due to pain." A.R. at 114. Dr. Beall concluded that she could have a "mild case of carpal tunnel syndrome on the left hand," and "peripheral neuropathy with features of demyelination and mild axonal degeneration." A.R. at 115. He noted that the results of an MRI (presumably the test completed on October 14, 2002, A.R. at 112) "showed only mild degenerative changes" in the thoracic and cervical spine. *Ibid.* He decided to perform more tests for peripheral neuropathy and rheumatological disorders.

The terms of the defendants' long term disability plan required the plaintiff to apply for Social Security disability benefits, which she did on September 18, 2002. On January 24, 2003, the Social Security Administration denied her claim, explaining that it had "determined that [the plaintiff's] condition is not severe enough to keep [her] from working. . . . Although your condition

may prevent you from retuning [sic] to your past employment, there are many uncomplicated light jobs that you should be able to do and therefore disability cannot be granted." A.R. at 118. The administrator considered the opinions of Drs. Beaulieu, Schultz, Adams, and Beall in reaching its decision.

The record also shows that on March 3, 2003, Dr. Beall reviewed the results of an October 14, 2002 MRI of the brain. His read detected three lesions, but he noted that they were not diagnostic of multiple sclerosis. Other tests, including those for diabetes and lupus, were normal. The plaintiff also reported that the weakness in her arms had gotten worse. Dr. Beall was unsure about the cause of the plaintiff's symptoms and ordered additional tests to rule out celiac disease and demyelinative disorder or polymyositis. A.R. at 128-29.

On March 24, 2003, another brain MRI exam was conducted on the plaintiff. Dr. Beall reviewed the results on May 13, 2003 and found that two of the lesions noted on the previous MRI had disappeared, leading Dr. Beall to rule out microvascular ischemic disease and multiple sclerosis. However, the plaintiff reported tingling in her leg, weakness in her arms, aching in her joints, and numbness in her toes. However, she "had resolution of the right upper extremity weakness. . . . [S]he no longer has the moderate knee flexor weakness that was seen on my exam on the 30th of January." A.R. at 137. Dr. Beall noted that Pyridoxine excess could lead to numbness, and the plaintiff's B6 levels were elevated. He suggested an EKG and a spinal tap.

The defendants continued to follow the plaintiff to ensure she still qualified for disability. A file note dated May 14, 2003 recited the plaintiff's symptoms and test results, concluding with the statement, "Medical supports continuing disability." A.R. at 34.

However, on June 25, 2003, Dr. Beall noted that the plaintiff "had complete resolution of the weakness that she had" during her last exam. A.R. at 151. Nonetheless, the plaintiff continued to report pain in her back and aching and numbness in her right arm. Dr. Beall wrote that the plaintiff's MRI results did "not fulfill clinical criteria for a diagnosis of multiple sclerosis." A.R. at 151.

After receiving additional documentation from the plaintiff's physicians, the defendants reassessed their position and concluded that "[t]he documentation provided by the neurologist does not support ee's inability to perform the sedentary work-related activities and family practitioner's opinions regarding an inability to return to work is not supported by clinical evidence at this time." A.R. at 36. On August 11, 2003, the defendants asked Dr. Beall to provide additional information and documentation of specific abnormal physical findings with a medical rationale as to why the plaintiff was unable to perform her job. The defendants received Dr. Beall's response on September 19, 2003, which stated that the plaintiff "had a complete resolution of any weakness she had during the last examination." A.R. at 151. Dr. Beall also reported that the plaintiff did not have multiple sclerosis. Based on this information, the defendants concluded that the medical evidence did not support a finding of disability.

On September 9, 2003, the plaintiff sought mental health treatment. She was preliminarily diagnosed with long term adjustment reaction disorder. The records of this visit were sent to the defendants.

On November 4, 2003, the defendants completed an employment analysis of the plaintiff. The analyst reviewed office notes from Dr. Beaulieu and Dr. Beall. The analyst reported that Dr. Beall's June 25 notes indicated that the plaintiff did not have MS and that her weakness had been resolved. Because of this, a letter was sent to Dr. Beall requesting that he "provide medical rationale

-6-

if Ms. Bauer was not able to return to work in aسedentary capacity." Dr. Beall was asked to respond by October 23, 2003. When the defendants received no response from Dr. Beall, they attempted to contact him but were told that he had left the practice.

The analyst also reviewed notes related to the plaintiff's mental health issues and reported that the notes of October 16, 2003 supported a diagnosis of a psychiatric disability that was expected to resolve in six months. The analyst found that the plaintiff's depression was "mainly situational in nature and stress related." A.R. at 164. The analyst concluded that the plaintiff no longer met the definition of disability in the plan because the medical data from her physicians did not provide any basis for concluding that the plaintiff could not perform her sedentary work, and the therapist notes did not indicate the plaintiff could not perform 'the cognitive demands of her own job." A.R. at 165.

On November 26, 2003, the defendants sent the plaintiff a letter notifying her that her benefits would be terminated as of December 1, 2003. The letter explained the definition of disability and informed the plaintiff that "objective medical evidence is required to substantiate the existence of a disabling condition as defined by your plan." A.R. at 167. The case manager recited the medical information in the defendants' file and stated, "After giving careful consideration of the most recent medical documentation regarding, it is MetLife's determination that the submitted records no longer support an inability to return to the sedentary nature of your own job." A.R. at 168.

On December 29, 2003, the plaintiff appealed the termination of her benefits. In her letter, the plaintiff informed the defendants that since November 17, 2003 she had also been seeing Dr. Prakash, a rheumatologist, who believed she was suffering from Sjogren's Syndrome or

-7-

fibromyalgia. In addition, the plaintiff complained about the defendants' failure to contact her when they could not reach Dr. Beall.

Along with her appeal letter, the plaintiff submitted a December 23, 2003 letter from Dr. Beaulieu to the defendants regarding the plaintiff's condition. Dr. Beaulieu wrote that the plaintiff was "unable to work due to her pain and weakness which have originated in her back but now are involving the extremities. She is also currently under treatment for severe anxiety." A.R. at 175. Dr. Beaulieu also stated that he and the plaintiff's other doctors were still not sure what was causing the plaintiff's symptoms. *Ibid.* (noting "we still do not have a clear diagnosis for the cause of her many problems"). The plaintiff also submitted a December 18, 2003 letter from Laurie Clements, a clinical social worker treating the plaintiff for anxiety and depression, who stated that the plaintiff has "problems when dealing with people" and "is very depressed, causing an inability to focus and concentrate." A.R. at 176.

The plaintiff also submitted medical records and documents from her visits with Dr. Prakash. Dr. Prakash diagnosed the plaintiff with fibromyalgia, although he wrote a letter to Dr. Beall in which he stated, "Five trigger points for fibromyalgia were tender." A.R. at 181. Dr. Prakash also stated, "The differential diagnosis includes fibromyalgia, spondyloarthropathy, Sjogren's syndrome, and less likely other diseases." *Ibid.* He suggested additional tests.

The plaintiff also submitted additional documentation from Dr. Beall regarding numbness she experienced in her legs from late July through September 19, 2003. Dr. Beall stated at that time that "the diagnosis is still probable multiple sclerosis" and recommended a spinal tap, A.R. at 193, but Dr. Beall had previously ruled out multiple sclerosis because the plaintiff "had only one attack." A.R. at 151.

-8-

On December 29, 2003, the plaintiff again visited Dr. Prakash. His notes regarding this visit state "all trigger points were tender and she had dry eyes and dry mouth." A.R. at 197. This note is somewhat cryptic, in that the doctor does not distinguish between diagnostic trigger points and control trigger points that are used to rule out fibromyalgia. However, it appears that Dr. Prakash may have suspected the plaintiff of exaggerating her symptoms, since he notes that he discussed the test results with the plaintiff, told her that her blood work had improved, but noted that he was "puzzled why her symptoms ha[d] not improved. We discussed the possible reasons for this, and she reassured me that she wants to get better and is not just after disability." *Ibid.* Dr. Prakash then suggested that the plaintiff have a lip biopsy to determine whether she has Sjogren's syndrome.

On January 23, 2004, Dr. Beall submitted a letter in which he states the plaintiff is being treated for fibromyalgia and Sjogren's syndrome. Dr. Beall wrote that "at this point in time [the plaintiff] cannot work at all due to pain and has not been able to since January 2002." A.R. at 199.

On January 29, 2004, the defendants had the plaintiff's records reviewed by a medical consultant, Dr. Jefrey Lieberman, an internist and rheumatologist. Dr. Lieberman never physically examined the plaintiff, but he concluded that the plaintiff might have myelitis, Sjogren's disease, or fibromyalgia, although he believed Sjogren's disease was unlikely. He did acknowledge that "[a] salivary gland biopsy was suggested, but I do not know if this has been done. This would confirm a diagnosis of Sjogren's syndrome if positive." A.R. at 200.

Dr. Lieberman's report states that he spoke with Dr. Beall, who said that the plaintiff was capable of performing "the duties of a light or sedentary occupation." A.R. at 201. However, the record contains a note from the plaintiff stating that Dr. Beall retracted this statement, which was given when he did not have access to the plaintiff's file. A.R. at 215.

-9-

Dr. Lieberman concluded that the plaintiff was capable of performing the duties of her job. He stated the results of the tests performed by the plaintiff's doctors did not support any limitations on the plaintiff's abilities. He opined that even if the plaintiff had multiple sclerosis, which he did not believe her records supported, she could "still perform duties of gainful employment unless [the] disease becomes of such a severe nature that functionally [she] would be unable to do that." A.R. at 202.

On January 30, 2004, the defendants notified the plaintiff that her appeal was being rejected because she no longer met the definition of disability under the plan. A.R. at 203. The defendants' representative discussed the medical consultant's opinion, Dr. Beall's statements, and the test results. The defendants concluded that "[t]he medical documentation on file does not provide evidence that you were precluded from performing your regular job. Consequently, this period of work is not eligible for Disability Benefits." A.R. at 204.

On February 2, 2004, the plaintiff received the results of a lip biopsy that had been done on January 19, 2004 that showed she had Sjogren's syndrome. A.R. at 211. The plaintiff notified the defendants of the results of the biopsy, but the defendants responded that a decision had already been made regarding her appeal.

On April 22, 2004, the plaintiff visited Dr. Beall again. The plaintiff by this point was walking with a cane. She reported back pain, numbness, and loss of sensation in her feet. Dr. Beall found these related to her Sjogren's disease.

On May 27, 2004, the plaintiff filed a complaint in this Court alleging that the defendants violated ERISA in denying her benefits. The defendants requested additional time to consider the plaintiff's case, including medical records from exams completed after January 30, 2004. The Court

remanded the case to the plan administrator on December 29, 2004 for additional consideration of the new evidence.

On January 31, 2005, the defendants had the plaintiff's file reviewed by Dr. Joseph J. Jares, a neurologist. He reviewed the medical test results and read the records of Drs. Beall, Beaulieu, Prakash, Lieberman, and social worker James Casey. Dr. Jares attempted to contact Dr. Beall to obtain additional information, placing three telephone calls to Dr. Beall's office; however, Dr. Jares was unable to reach Dr. Beall before submitting his report. In his report, Dr. Jares summarized the plaintiff's medical history and concluded that the plaintiff suffers from chronic pain disorder, Sjogren syndrome, peripheral neuropathy, and anxiety and depression. He stated, "From the objective records, which are available, there is no indication of the presence of a condition so severe that Ms. Bauer could not perform her usual sedentary occupation. Most of her symptoms are of self-reported or subjective nature including pain, fatigue, depression, and anxiety." A.R. at 222. He discounted the plaintiff's mental impairment, stating, "There is no objective information submitted that would indicate any objective cognitive impairment." A.R. at 223. Dr. Jares completed a form assessing the plaintiff's physical capabilities and concluded that the plaintiff could sit for eight hours and stand or walk for two hours if allowed to change position as needed.

On February 14, 2005, a letter was sent to the plaintiff's lawyer, notifying her that her appeal was denied. A.R. at 227. After thoroughly discussing the medical records and relying heavily on Dr. Jares' review and opinion, the case management specialist concluded:

> Dr. Jares states that from the objective records, which are available, there is no indication of the presence of a condition so severe that she could not perform her usual sedentary occupation. Most of her symptoms are of a self-reported or subjective nature, including pain, fatigue, depression and anxiety. From a safety perspective, given the use of potentially hypnosedative medication, i.e. narcotic pain

> medications, she should avoid working at heights, around dangerous machinery and should be cautious driving.
>
> Dr. Jares states that the records submitted are supportive of the fact that Ms. Bauer is capable of working in her usual sedentary position as a payables clerk. The records do not support her complete inability to work. The medical records suggest that she has a chronic pain disorder, most likely from Sjorgren's [sic] syndrome, with a neurological, rhuematologic [sic] and neuropsychiatric manifestation. However, from an objective assessment, it has not been shown that this would render her incapable of working in her usual sedentary occupation. She should be allowed to reposition as necessary. There is no objective information submitted that would indicate any cognitive impairment.

A.R. at 230.

After this letter was sent, the parties submitted their respective cross motions.

## II.

The plaintiff challenges the denial of benefits under Section 502(a)(1)(B) of ERISA, which authorizes an individual to bring an action "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). She makes three specific arguments as to why the plan administrator's decision ought not stand. First, although the plaintiff acknowledges that the treating doctor rule does not apply in ERISA cases, *see Black and Decker Disability Plan v. Nord,* 538 U.S. 822 (2003), she states that the defendants were arbitrary and capricious in disregarding the opinion of three doctors who have seen and examined the plaintiff about once a month in favor of the opinions of two consulting witnesses who have never seen the plaintiff. She cites the recent decision of *Kalish v. Liberty Mutual*, 419 F.3d 501 (6th Cir. 2005), for the proposition that treating physicians who actually have seen the patient are entitled to greater deference than the defendants' reviewing doctors who only read records. Second, the plaintiff contends that the defendants selectively read the record and erroneously relied upon Dr. Jares'

review, in which he improperly discounted the pain the plaintiff experienced because it cannot be objectively measured and "virtually ignored" her anxiety and depression, while ignoring all the treating and hands-on examining physicians. Third, the plaintiff believes there is a conflict of interest because the defendant Met Life both administers and guarantees the plan.

The defendants argues in their response that it is proper and reasonable to require objective evidence to support subjective complaints, citing *Yeager v. Reliance Standard Life Insurance Co.*, 88 F.3d 376 (6th Cir. 1996). In the present case, the defendants contend they had a reasonable basis to conclude that the plaintiff no longer met the plan definition of disability because no such objective evidence has been submitted by the plaintiff that shows she cannot work. Although the defendants acknowledge that the plaintiff has been objectively diagnosed with Sjogren's syndrome, the defendants point out that there has still been no evidence provided that the disease prevents her from working.

The parties agree that the standard of review of the plan administrator's decision in this case is the arbitrary and capricious standard. This deferential review is appropriate when the ERISA plan at issue, as here, provides a clear grant of discretion to the plan administrator and the decision being appealed was made in compliance with plan procedures. *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595, 597 (6th Cir. 2001). The arbitrary or capricious standard of review "is the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003) (internal quotes and citation omitted). When applying this standard, the court must determine whether the administrator's decision was reasonable in light of the available evidence. Although the evidence may be sufficient

to support a finding of disability, if there is a reasonable explanation for the administrator's decision denying benefits in light of the plan's provisions, then the decision was not arbitrary or capricious. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000). A decision reviewed according to this standard must be upheld if it is supported by "substantial evidence." *Baker v. United Mine Workers of Am. Health & Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991). Substantial evidence supports an administrator's decision if the evidence is "rational in light of the plan's provisions." *See Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997).

Although the plaintiff has raised several issues, the crux of this case is whether there is evidence in the administrative record to justify the defendants' actions in light of the applicable review standard. "[T]he validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). In such an action, the court generally considers only that evidence presented to the plan administrator at the time he or she determined the employee's eligibility in accordance with the plan's terms. *Smith*, 129 F.3d at 863. The court's review thus is limited to the administrative record. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 618 (6th Cir. 1998).

The plaintiff's claim involved only Phase I disability. Under the terms of the plan, she would be entitled to benefits if, "because of a sickness or an injury, [she could not] perform [her] regular job or any other reasonably appropriate job [her] Employer can provide." A.R. at 6. The Sixth Circuit has held that the plaintiff in an ERISA benefits case bears the burden at all times in proving continuous disability as defined by the plan. *See Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991). The plaintiff contends that she has met that burden with evidence submitted by her treating doctors, and the only contrary evidence comes from physicians retained by the

defendants who never actually examined the plaintiff. She believes that *Calvert v. First Star Finance, Inc.*, 409 F.3d 286 (6th Cir. 2005), requires reversal of the plan administrator's decision because the defendants' doctors never examined the plaintiff themselves.

In *Calvert*, the Sixth Circuit found an arbitrator's decision to deny long term benefits arbitrary and capricious where no physical examination was conducted by the defendant. However, that was only one factor the court considered, and the court specifically noted that there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Id.* at 296. In that case, the reviewer failed to mention objective tests results that were contained in the administrative record, such as surgical reports, x-rays, and CT scans. The reviewer appeared to be ignorant about important parts of the plaintiff's medical history, leading the court to conclude that he had not actually done a thorough review of the plaintiff's medical records. The court found a decision based on such a shoddy review arbitrary and capricious. It was not the paper-only review itself that made a difference, but the poor job the reviewer did.

In this case, the medical consultants, particularly Dr. Jares, appear to have conducted a thorough review of the records. His report lists the documents he reviewed, a list that includes documents from all the plaintiff's doctors as well as laboratory test results and MRIs. *See* A.R. at 219. Dr. Jares attempted to call the plaintiff's doctor, Dr. Beall, on three occasions to speak with him personally, but was unable to reach him. Although the plaintiff claims Dr. Jares "virtually ignored" her anxiety and depression, he did mention it and stated, "From the objective records, which are available, there is no indication of the presence of a condition so severe that Ms. Bauer could not perform her usual sedentary occupation. Most of her symptoms are of self-reported or subjective nature including pain, fatigue, depression, and anxiety." A.R. at 222.

The plaintiff complains that the defendants' insistence on objective evidence to support her claimed impairments is unreasonable, and in the end her condition was objectively confirmed when she tested positive for Sjogren's syndrome. However, the administrative record plainly demonstrates the defendants' acceptance of that diagnosis after the matter was remanded for further consideration. Nonetheless, the plan provisions at issue define disability in terms of functional limitations that prevent an employee from performing her job. The question of disability is an assessment of what the employee can and cannot do, not what she does and does not suffer from. There is no information in the record describing Sjogren's syndrome. The plaintiff states in her motion that it is "a serious auto-immune disorder in which immune cells attack moisture producing glands of the body and which can produce painful eye and mouth dryness, debilitating fatigue, joint pain and damage to vital organs. There is no known cure." Pl.'s Mot. at 10 n.1. Yet there are no statements from physicians that tie this condition to the plaintiff's subjective complaints except for Dr. Beall, who noted on April 22, 2004 that her peripheral neuropathy was "associated with this disease," which "contribut[ed] to her ataxia." A.R. at 213. However, it was Dr. Beall who stated seven months earlier that the plaintiff "had a complete resolution of any weakness she had during the last examination." A.R. at 151.

The defendants' initial denial letter referenced the absence of objective evidence supporting the plaintiff's physical disability claim. If that were the only reason for the denial, the Court would have little trouble reversing because the plan itself does not require "objective" proof of disability. However, it is not unreasonable for a plan administrator to seek a medical or psychiatric explanation tying the conclusion that the claimant is disabled to some medical finding that supports it, particularly when there are statements in the record that are suggestive of an improvement or

-16-

resolution of conditions. *See Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 382 (6th Cir. 1996) (holding that "[i]n the absence of any definite anatomic explanations of plaintiff's symptoms, we cannot find that the administrator's decision to deny benefits was not arbitrary and capricious"); *see also Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 382 n.6 (7th Cir.1994) (finding that a claim for benefits based on psychiatric disability "require[s] objective psychiatric evidence linking [the] symptoms to a psychiatric disorder that is totally disabling"). Here the record contains evidence of an improving condition, denial of Social Security disability benefits on the basis that the plaintiff was not disabled within the meaning of the Social Security Act, and Dr. Jares' gloss on the plaintiff's complete medical file. The defendants' conclusion that the evidence submitted did not establish that the plaintiff could not by perform sedentary work was "rational in light of the plan's provisions." *Smith*, 129 F.3d at 863.

Nor does the fact that the defendants accepted their own physicians' opinions over those of the plaintiff's treating physicians require reversal. The treating physician rule, a familiar evidentiary directive in Social Security disability cases, plays no corresponding role in ERISA disability cases. *Nord,* 538 U.S. at 825. The Sixth Circuit assessed the conflicting opinions of treating and non-treating sources from a somewhat different perspective in *Kalish v. Liberty Mutual*, accepting the argument "that greater deference should be accorded to the opinion of [a treating physician], not because he was Kalish's treating physician, but because [he] actually conducted physical examinations of Kalish while [the medical consultant] reviewed only Kalish's medical records." 419 F.3d at 509. However, that distinction, although relevant, is not controlling. *Ibid.* (stating that "[w]hether a doctor has physically examined the claimant is indeed one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater

-17-

weight to the opinion of its consulting physician"). As the court observed, if a file review is otherwise thorough, the failure to examine a claimant is not fatal to a denial decision. If, however, the file review is itself deficient or incomplete, failure to afford deference to a treating physician may be arbitrary. *Id.* at 510 (noting "[t]he fact that [the treater] had the opportunity to physically examine Kalish on numerous occasions, while [the consultant] relied exclusively on a file review, makes [the consultant]'s failure to discuss the findings of [the treater] all the more troublesome").

As noted above, in this case the defendants appear to have relied not only on the paper-only review of its consultants, but also on the statements of the plaintiff's own treating physicians, which were not entirely consistent. For instance, Dr. Beall opined at one point that the plaintiff's problems had resolved, and Dr. Prakash seems to have expressed some measure of doubt about the plaintiff's report of symptoms when he saw fit to comment that he was "puzzled why her symptoms ha[d] not improved" despite favorable test results. A.R. at 197. He then stated, "We discussed the possible reasons for this, and she reassured me that she wants to get better and is not just after disability." *Ibid.* There is no implication of arbitrariness that can be drawn from the defendants' failure to give controlling weight to these physicians.

The plaintiff also cites *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161 (6th Cir. 2003). However, that case is much different than the case here. In *McDonald*, the defendant's own consultants had questioned the plaintiff's ability to work. The court also suspected a third consultant may have changed his opinion based on a call he received from the defendant. The court stated the defendant made its decision on the basis of one doctor's opinion that the plaintiff might be able to work, which the court found arbitrary and capricious. In addition, that plaintiff had been receiving

-18-

benefits for seven years, and the court found that there had been no change in his condition since the time the defendant granted the benefits.

Finally, the plaintiff contends that a structural conflict of interest exists because Met Life both funds the long term disability plan and passes on the benefits applications. The administrative record confirms that Met Life covers benefits under Phase I of the plan, and Dow covers the Phase II benefits through its employee welfare benefit trust or its general assets. A.R. at 10. The presence of a conflict of interest does not require relaxation of the deferential arbitrary and capricious review standard or mandate *de novo* review of the plan administrator's decision. *Marchetti v. Sun Life Assur. Co. of Canada*, 30 F. Supp. 2d 1001, 1007 (M.D. Tenn. 1998). Rather, the conflict of interest is a factor taken into account when evaluating the decision under the arbitrary and capricious standard. *Calvert*, 409 F.3d at 297; *see also University Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 (6th Cir. 2000). The mere existence of a structural conflict of interest is not enough to justify heightened scrutiny of the plan administrator's decision. The plaintiff must provide actual evidence that the conflict of interest had some effect on the administrator's decision. *See Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998). No such evidence was presented in this case.

### III.

The Court finds that there is a reasonable explanation for the administrator's decision to deny benefits in this case in light of the plan's provisions and the evidence contained in the administrative record.

Accordingly, it is **ORDERED** that the defendants' motion to affirm the plan administrator's decision [dkt # 21] is **GRANTED**.

It is further **ORDERED** that the plaintiff's motion to reverse the plan administrator's decision and award benefits [dkt # 20] is **DENIED**, and the plaintiff's complaint is **DISMISSED WITH PREJUDICE**.

                                           s/David M. Lawson
                                           DAVID M. LAWSON
                                           United States District Judge

Dated: October 25, 2005

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 25, 2005.

                                 s/Tracy A. Jacobs
                                 TRACY A. JACOBS